UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| THOMAS FRENCH,<br><br>    Plaintiff,<br><br>    v.<br><br>PIERCE COUNTY; ARRON WOLFE; JASON CHAVEZ,<br><br>    Defendants. | CASE NO. 3:22-cv-5079<br><br>ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## 1.  INTRODUCTION

This matter comes before the Court on Defendants Arron Wolfe and Jason Chavez's Motion for Summary Judgment. Dkt. No. 32. The Court has reviewed the papers submitted in support of and in opposition to the motion, heard oral argument from the parties, and is otherwise completely informed. For the reasons explained below, the Court GRANTS Defendants' motion.

## 2.  BACKGROUND

On November 3, 2019, Curtis French was at home with his family in Tacoma, Washington, including his son, Thomas French; daughter-in-law; two grandchildren; and his former spouse, Krystal French, with whom he had recently

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

gotten back together.[1] Dkt. No. 42 ¶ 3. According to a family member, Curtis had been dealing with issues at home and at work at the time. *Id.* ¶ 4. On November 3rd Curtis argued with Krystal and drank a 750ml bottle of whiskey. *Id.* ¶ 5.

After finishing the bottle, Curtis "began stumbling around the house, [and] speaking and yelling incoherently." *Id.* ¶ 6. At some point, he picked up a "small" knife and "began making what seemed to be threats towards the adults in the house." *Id.* Curtis's daughter-in-law called 911 shortly after 6 P.M. because she "thought it would be safer for everyone, including himself, if [Curtis] left the house." She felt he would only leave, however, "if he was forced to." *Id.* ¶¶ 7-8.

The 911 call "seemed to make Curtis angry." *Id.* ¶ 8. He was walking around the house making threatening gestures with the knife, and at one point, threw the knife at the wall. *Id.* While still on the 911 call, Curtis's daughter-in-law and Krystal left through the front door of the house, and Thomas took one of his children out the backdoor while his other child slept upstairs. *Id.* ¶ 9. Curtis's daughter-in-law described Curtis as "really, really, drunk" to the 911 dispatcher. *Id.* ¶ 8.

Curtis went to the front porch of the house where he stood alone when Pierce County Sheriff's deputies Arron Wolfe and Jason Chavez arrived. *Id.* ¶ 11. When the deputies arrived, they identified themselves as police and directed Curtis to

---

[1] Following Plaintiff's lead from his Second Amended Complaint, the Court refers to Curtis French by his first name only to avoid confusion with his other family members. The Court refers to Thomas French by his first name for the same reason. No disrespect is meant.

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 2

"come out and let [us] see your hands," but Curtis did not respond. Dkt. No. 33-1 at 4-5.

The officers stood in the middle of the street as Curtis's daughter-in-law "saw [him] stumble down the steps toward the Officers." Dkt. No. 42 ¶¶ 12, 14. According to her, Curtis swayed and then fell onto a car parked in front of the house. *Id.* ¶ 14.

Deputy Wolfe used the flashlight on his rifle while Deputy Chavez used a flashlight at which point they saw Curtis "in front of two vehicles parked towards the house, just past a chain-link fence." Dkt. Nos. 33-1 at 5-6; 33-2 at 3. According to Defendants, they were approximately 25 to 30 yards from Curtis's house. Dkt. No. 33-1 at 5-6.

Curtis held the knife in his left hand. *Id.* at 7. When the deputies ordered Curtis to drop the knife, he responded, "Fuck you, kill me! Fuck you, kill me!" *Id.* The deputies each recount that Curtis was "focused' and "fixated" on them and continued to advance toward the deputies. Dkt. Nos. 33-1 at 9; 33-3 at 8. Deputy Chavez also recalls that "I want him to be focused on me[;] I don't want him to go back in the house[,] that was my big concern." Dkt. No. 33-3 at 8. As Curtis advanced toward the deputies, Deputy Chavez fired his taser at Curtis while Deputy Wolfe held his rifle. *See id.* at 6-12.

The taser probe hit Curtis in the chest, but it did not "phase" Curtis. Dkt. No. 33-1 at 11. Curtis continued his advance toward the deputies, ignoring their repeated commands to drop the knife. *Id.* at 13. Deputy Chavez ordered Curtis to "Stop or I'll shoot!" Dkt. 33-4 at 5. Curtis neither stopped nor dropped the knife, so

Deputy Chavez and Wolf fired their weapons killing Curtis. Dkt. Nos. 33-2 at 4; 33-4 at 5.

The parties dispute whether Curtis posed an immediate threat to the deputies given his intoxication. His daughter-in-law recalls that he was "ignoring [the deputies'] commands, but he was obviously intoxicated and impaired" and that he was too drunk to walk in a straight line. Dkt. No. 42 ¶¶ 12, 14. She said he was trying to regain his balance when the deputies shot him as he stood between the cars. *Id.* ¶ 14. A neighbor, viewing the incident from across the street, stated Curtis "seemed too drunk to be a threat at that time, especially when the officers were standing in the street at what appeared to be a safe distance away from Curtis when he was shot." Dkt. No. 43 at ¶ 5. Deputy Chavez, however, described Curtis as moving in a "deliberate, confident manner [with] his shoulders … rolled back" as he advanced just before the shooting. Dkt. 33-4 at 4.

Thomas (hereafter, "Plaintiff") filed this lawsuit as the administrator of Curtis's estate. Plaintiff asserts a single cause of action against Defendants for the use of excessive force in violation of Section 1983. Dkt. No. 29.

### 3. ANALYSIS

Defendants argue Curtis does not have a colorable Section 1983 excessive force claim because they "did not violate a clearly established constitutional right, and are, therefore, entitled to qualified immunity." Dkt. No. 32 at 1. Plaintiff responds that Curtis did not pose an immediate threat to Defendants when they shot him, and that Defendants were on notice that Curtis had a constitutional right

to be free from the use of deadly force under circumstances of this case. *See* Dkt. No. 39.[2]

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (internal citation omitted). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "in the light most favorable to the non-moving party." *Barnes v. Chase Home Fin., LLC*, 934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Summary judgment should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### 3.1 Excessive force.

The Court first examines whether Plaintiff has established a violation of Curtis's constitutionally protected rights. A police officer's use of deadly force to

---

[2] In his response, French also argued that Defendants' expert witness report was inadmissible under Fed. R. Evid. 702. At the hearing on Defendants' motion, the Court reserved ruling on this argument because French stated this argument was also raised in his motion in limine.
ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 5

restrain a subject is examined under the Fourth Amendment's prohibition against unreasonable searches and seizures. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). In reviewing any such use of deadly force, courts must "inquire 'whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted.'" *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024) (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003)). "To assess the reasonableness of a particular use of force, we balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'" *Id.* (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

Defendants use of deadly force against Curtis was an "unmatched" intrusion, *Tennessee v. Garner*, 471 U.S. 1, 9 (1985), so the Court turns to the strength of the government's interests.

Courts consider three factors—the *Graham* factors—when making this inquiry: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Smith v. City of Hemet*, 394 F.3d at 701 (9th Cir. 2005) (citing *Graham*, 490 U.S. at 396). Ultimately, it is the "totality of the circumstances" that will guide a decision about whether the *Graham* standard has been met, *Hart*, 99 F.4th at 553, but whether the suspect endangered the safety of the officers or others is "the most important single element of the three specified factors," *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

During oral argument, Plaintiff conceded many important facts that guide the Court's application of the *Graham* factors, including that: (1) Curtis was intoxicated and armed with a knife, (2) Curtis advanced toward the officers while armed with the knife, (2) Curtis yelled expletives at the officers (including statements like "Fuck you, kill me"), (3) Curtis was non-compliant with the officers commands to "Stop" and "drop the knife," and (4) the officers used non-deadly force in the form of a taser before using deadly force. Thus, under the totality of the circumstances, the officers were justified in their use of deadly force because they reasonably perceived that Curtis posed an immediate threat to them and others. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Plaintiff tries to escape this conclusion by arguing there is a question of fact that cannot be resolved on summary judgment about whether Curtis posed a threat to the officers' or others' safety when he was shot. He points primarily to questions about the distance between the officers and Curtis at the time of the shooting and Curtis's level of intoxication. *See* Dkt. No. 39 at 6. But as explained below, these asserted factual disputes do not "eliminate any of [the] core, undisputed circumstances" that lead to the conclusion that Curtis posed an immediate threat to Defendants. *See Hart*, 99 F.4th at 550.

First, Plaintiff contends there is a discrepancy between Deputy Chavez's and Deputy Wolfe's account about the distance between them and Curtis when deadly force was used. Plaintiff claims that Deputy Chavez said Curtis was about 12-15

feet away when he used his taser, while, according to Plaintiff, Deputy Wolfe claims Curtis was 12 yards or 36 feet away. Dkt. No. 39 at 6. But Plaintiff's attempt to demonstrate a genuine dispute about the distance regarding the distance between Defendants and Curtis falls short because he omits the context of Deputy Wolfe's statement: "[Curtis] was about 12 yards away when I saw Taser prongs from Deputy Chavez's Taser strike [him] . . . He turned as if to see where the prongs had come and looked toward Deputy Chavez who had just shot him with the Taser. He began to take more aggressive steps." Dkt. No. 33-2 at 4. In other words, Deputy Wolfe claims that Curtis continued to close the distance between himself and the Defendants after being hit with the Taser at approximately 12 yards. *See id.*

Even assuming that Curtis was 36 feet away from Defendants at the time of the shooting, Plaintiff cites no cases supporting the proposition that distance alone is dispositive when determining whether a suspect posed an immediate threat to law enforcement. *See* Dkt. No. 39. Rather, courts look to the totality of the circumstances to determine whether a suspect posed an immediate threat to the safety of the officers or others. *Hart*, 99 F.4th at 553.

For example, in *Est. of Hernandez by & through Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1217 (9th Cir. 2024), the Ninth Circuit held that an officer acted reasonably when using deadly force against a suspect who was 40 feet away. In *Hernandez*, the officer believed the suspect held a knife and gave him multiple orders to "stay right there!" *Id.* The suspect continued to approach the officer, with his arms out, yelling in the officer's direction, and ignoring her commands to drop the knife. *Id.* The Ninth Circuit held that "[u]nder these circumstances, use of

deadly force to eliminate the objectively apparent threat that Hernandez imminently posed was reasonable as a matter of law." *Id*. About the distance between the officer and suspect at the time of the shooting, the court reiterated "there is no rule that officers must wait until a knife-wielding suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force." *Id.* (quoting *Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019).

Like the suspect in *Hernandez,* the undisputed facts show that Curtis—whether he was 12 feet away or 36 feet away and closing—was armed with a knife and continued to close the distance between himself and Defendants while ignoring their commands to stop. *Id.*; *see also Reich*, 945 F.3d at 982 (6th Cir. 2019) (holding that shooting of approaching knife-wielding suspect within six feet was reasonable and that even shooting a knife-wielding suspect 36 feet away would not violate clearly established law). Unlike the officers in *Hernandez*, Defendants first attempted to use non-lethal force in the form of a taser before resorting to deadly force. *See* 96 F.4th at 1214. Thus, under these circumstances, it makes no difference whether Curtis was 12 feet or 36 feet away in the larger context of his actions and the officers' use of deadly force.

Next, French argues that Curtis, "[i]n his impaired state . . . did not have the faculties to make a credible threat to the Deputies' safety . . . ." Dkt. No. 39 at 12. Plaintiff offers no case law, however, holding that when analyzing an excessive force claim, an armed suspect's immediate threat to police officers is canceled out when the suspect is intoxicated. *See* Dkt. No. 39. In fact, under questioning at oral argument, Plaintiff conceded that intoxicated suspects do not enjoy a more lax

standard when analyzing excessive force claims. Plaintiff argued instead that intoxication and mental health should also be considered when analyzing whether a suspect poses an immediate threat.

To be sure, when analyzing the use of deadly force on an intoxicated or mentally ill suspect, additional factors like the availability of less intrusive force and the use of proper warnings are to be considered alongside the traditional *Graham* factors. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018); s*ee also Demarest v. City of Vallejo, California*, 44 F.4th 1209, 1225 (9th Cir. 2022) ("In judging the reasonableness of the force used, the trier of fact should consider all relevant circumstances . . ."). But the Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals . . . ." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 n.9 (9th Cir. 2018) (internal quotation marks and citation omitted). This makes sense because the presence of "mental illness or intoxication does not reduce the immediate and significant threat a suspect poses." *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020). To the contrary, these conditions can contribute to the unpredictability of the situation and increase the danger for all involved in a law enforcement encounter. *See Marvin v. City of Taylor*, 509 F.3d 234, 246 (6th Cir. 2007) ("Drunk persons are generally unpredictable and Marvin's unpredictability created a situation where it was not objectively unreasonable for the Defendants to take the extra precaution of handcuffing Marvin behind his back rather than in front.").

Here, Defendants repeatedly warned a very intoxicated Curtis to stop and to drop the knife. They used non-lethal force in an attempt to stop his advance, but Curtis continued forward armed and shouting threats when the officers resorted to deadly force. *See* Dkt. No. 42 ¶ 12. This was a chaotic scene and perhaps different actions by those involved may have led to a different outcome, but officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

It is tragic whenever the police use deadly force, especially on someone experiencing a mental health emergency or intoxication. But viewing the facts in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the undisputed facts establish that Defendants' use of deadly force against Curtis was objectively reasonable. Whether Curtis was 12 feet or 12 yards from Defendants, of clear mind or diminished in some way, does not change this conclusion. *See Hart*, 99 F.4th at 555 ("Ultimately, that an individual who poses an immediate threat may be mentally ill does not remove the case from the *Graham* analysis . . . and any mental health crisis Hart experienced is considered in view of the surrounding circumstances."). Thus, Defendants have shown there are no genuine disputes about any material fact and that they are entitled to judgment as a matter of law.

Because there has been no Fourth Amendment violation, the Court does reach the issue of qualified immunity.

## 4.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED, and Plaintiff's case is dismissed with prejudice.

Dated this 28th day of May, 2024.

Jamal N. Whitehead
United States District Judge